[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this action, plaintiff Nynex Meridian Systems ("Nynex"), a joint venture partnership engaged in the business of servicing and maintaining telephone communications systems, has sued defendant Moore Medical Corporation ("Moore") for breach of contract based on what it claims to have been Moore's unjustified, unlawful repudiation of a systems maintenance and servicing contract between them.
Claiming that Moore repudiated the contract in the eleventh CT Page 5276 month of the three-year contract period, the plaintiff now seeks to recover damages for all profits it lost during the twenty-five-month balance of the period and for all services it performed but was not paid for prior to the defendant's repudiation.
The defendant counters the foregoing allegations by asserting that instead of wrongfully repudiating a three-year contract, it properly declined to renew a one-year Contract. Therefore, though it expressly stipulates and agrees that it owes the plaintiff $1515.50 for unpaid services it performed prior to the termination of the Contract, the defendant flatly denies that it has any obligation to reimburse the plaintiff for profits it might have earned had the contract been extended for an additional two years.
The case was tried before this Court on December 6, 1994. At the trial, the plaintiff presented ten numbered exhibits and the testimony of a single witness, former Nynex service manager Glenn LePore. The defendant, for its part, presented eight numbered exhibits and the testimony a single witness, former Moore administrative services manager Marcia Wahl-Flynn (formerly Marcia Wahl).
Following the trial, the Court continued the case until January 13, 1995 so that the parties could submit proposed findings of fact and conclusions of law in preparation for oral argument. At or about the time when the parties submitted their final briefs, however, the parties asked the Court to decide the case "on the papers," without oral argument. Acceding to this request, the Court cancelled the scheduled argument and took the case under advisement.
FINDINGS OF FACT
Based on the evidence presented at trial, the Court makes the following findings of fact:
1. Plaintiff Nynex is a joint venture partnership of Nynex (NMS) Co. and Northern Telecom (NMS) Inc. (NTI). At all times relevant to this case, Nynex was engaged in the business of servicing and maintaining telecommunications systems. CT Page 5277
2. On or about June 1, 1990, NTI assigned to plaintiff Nynex a Contract by which, on March 26, 1990, it had agreed with defendant Moore to service and maintain telecommunications systems on Moore's premises in New Britain, Connecticut. The Contract, which was introduced at trial as Plaintiff's Exhibit 5, is a seven-page document consisting of five pages labelled "Service Contract," which contain ten numbered sections listing contract terms and conditions, and two attached pages labelled "Annex 1," which list the telecommunications hardware on Moore's New Britain premises to be serviced under the Contract.
 3. By its own terms, the Contract constitutes the entire Agreement between NTI and Customer [Moore] with respect to the subject matter hereof and supersedes all previous negotiations, proposals, commitments, writings and understandings of any nature whatsoever.
Contract, § 10. It further provides that
 Any changes to this Contract requested by Customer [Moore] or NTI may only be affected (sic) if mutually agreed upon in writing.
Id., § 10.
4. In Section 1 of the Contract, labelled "Service,"[1] Northern Telecom, Inc. "(NTI") and Moore agreed as follows:
 NTI will, at its option, either repair or replace ("Service") any component part of the hardware listed on Annex 1 ("Hardware") when it malfunctions.
5. In Section 2 of the Contract, labelled "Service Site, Term and Charge," the contracting parties agreed that
The Hardware is installed at 370 John CT Page 5278 Downey Drive, New Britain CT 06050 ("Service Site"). NTI shall provide Service at the Service Site for a period of three (3) years commencing on March 16, 1990 ("Term"). The monthly charge for Service during the Term shall be $1815.00. Such charge is based upon the Hardware consisting of 418 ports and the other components of the Hardware listed on Annex 1 for which the charge for Service is not calculated on a per port basis. This charge for Service shall be paid quarterly in advance, plus any applicable taxes. NTI reserves the right during the Term or any renewal period, to increase the charge for Service in accordance with NTI's then current charges to reflect changes made during the Term of (sic) any renewal period in either the type or quantity of Hardware. (Emphasis supplied).
6. Section 5 of the Contract, labelled "Condition of Service," provides further that:
 NTI's obligation to perform Service is conditioned upon the Hardware not having been altered or repaired by any party other than NTI, without NTI's written consent, and the malfunction not being the result of mishandling, abuse, misuse or improper storage, installation, maintenance or operation by other than NTI (including use in conjunction with equipment electrically or mechanically incompatible) and upon the Hardware not having been damaged by fire, explosion, power failure, any act of God, or by any other cause whatsoever other than NTI.
7. Section 6 of the Contract, labelled "Additional CT Page 5279 Services," then states that:
 Upon Customer's request, NTI shall perform the installation of additions to the Hardware, moves and changes of the Hardware and the features associated therewith and the repair or replacement of Hardware which has malfunctioned as a result of any of the causes described in Section 5. These services ("Additional Services") which shall include services performed by NTI pursuant to NTI's "Customer Service Order" form shall be at Customer's sole expense, at NTI's applicable rates for material and labor therefore (sic), and subject to the provisions of Sections 7 and 8. The charge for Additional Services shall be due and payable to NTI within thirty (30) days of NTI's invoicing therefore (sic).
8. Section 8 of the Contract, labelled "Remedies and Limitations of Damages, Remedies and Warranties," provides in relevant part as follows:
 In the event of any material breach of this Contract by NTI which shall continue for fifteen (15) or more days after written notice of such breach (including a reasonably detailed statement of the nature of such breach) shall have been given to NTI by Customer, Customer's sole and exclusive remedy shall be to terminate this Contract by providing written notice thereof to NTI.
 In the event Customer fails to pay the charge for Service or Additional Services when due, NTI shall have the right to suspend its performance under this Contract upon providing written notice thereof to Customer and/or to CT Page 5280 terminate this Contract if Customer has not paid to NTI all amounts due NTI within fifteen (15) days of NTI's written notice thereof.
 In the event this Contract is terminated by either party, neither party shall have any further obligations to the other party except that NTI shall refund to Customer any portion of the charge paid for Service for the period subsequent to the effective date of termination less any amounts then due NTI for Service and/or claim for Additional Services performed prior to such termination. Termination of this Contract by NTI shall not constitute a waiver by NTI for any amounts due NTI for Services or Additional Services.
9. Section 9 of the Contract, labelled "Renewal," then states that:
 The charge for Service for the first and subsequent annual renewal periods shall be NTI's then existing charge for Service. NTI shall apprise Customer at least thirty (30) days prior to the end of the Term or any renewal period of such charge and provide Customer a revised Annex 1 or notify Customer that NTI shall not renew this Contract. Customer shall sign the revised Annex 1 and return a copy of the revised Annex 1 at least fifteen (15) days prior to the end of the Term or any renewal period. If NTI has not received such Annex 1 from Customer by such time Customer shall be deemed to have elected not to renew the Contract.
10. Finally, in Section 10 of the Contract, the parties agreed that CT Page 5281
 Customer may not assign or transfer this Contract or any rights or obligations hereunder without the prior written consent of NTI.
No comparable provision restricts the right of NTI to assign its rights and obligations under the Contract to another service provider such as Nynex.
11. From June 1, 1990 through February 1, 1991, plaintiff Nynex fully performed its obligations under the Contract, including the rendering of Service at the Service Site in New Britain and the performance of Additional Services when requested by defendant Moore.
12. On January 16, 1991, after ten months of the contract period, an error was made by a clerical employee of Nynex with regard to the annual inventory of Moore's Hardware. A letter was sent by Lorraine Long-Olson of Nynex to Marcia Wahl to Moore which enclosed "[t]hree original Service Contract Annex 1 Renewals" for the term of March 16, 1991 through March 15, 1992. The letter stated that "[t]he renewal applies to the existing executed service contract between your firm and Nynex Meridian Systems." Defendant's Exhibit 7. Attached to the letter were three copies of a two-page document captioned Annex 1 on the first page, and Annex 1A-Renewal on the second page. The Annex 1A-Renewal erroneously references the term of the current service contract as terminating on March 15, 1991. According to the testimony of Ms. Wahl at trial, the Annex documents contained an incorrect port count. Ms. Wahl later received another letter from Ms. Long-Olson dated January 29, 1991, which corrected the port count, but again erroneously contained incorrect language regarding the Contract Term in the Annex 1A-Renewal form.
13. On February 1, 1990, Gary Robinson of Moore sent a letter to Nynex notifying Nynex that Moore was cancelling "the existing maintenance contract" effective March 2, 1991. Plaintiff's Exhibit 8. On or about February 11, 1991, the error made by Ms. Long-Olson was discovered by other employees of Nynex and a letter was sent to Ms. Wahl of Moore acknowledging the error and enclosing the appropriate Annex document reflecting Hardware changes and CT Page 5282 pricing changes as authorized by Section 2 of the Contract. Plaintiff's Exhibit 9. Despite this notification, Moore refused to allow Nynex to perform under the contract. The defendant persisted in its refusal to allow Nynex to perform under the Contract despite a February 19, 1991 letter from Nynex's counsel advising the defendant that its conduct constituted an anticipatory breach of the Contract. Plaintiff's Exhibit 10.
14. Against the foregoing background, defendant Moore claims that the Contract was a one-year renewable Contract rather than a three-year Contract, as argued by the plaintiff. As additional support for this position, Moore notes that as early as April 2, 1990, when Ms. Long-Olson was still working for NTI, she returned a fully executed copy of the original Contract to Moore with a cover letter indicating that it covered the term March 16, 1990 through March 15, 1991. Furthermore, it points to language in the Annex 1A Renewal documents transmitted to Ms. Wahl in early 1991 which stated that:
 Customer shall sign this Annex 1 and return a copy thereof to [NYNEX] on or before February 22, 1991. If [NYNEX] has not received a copy of this revised Annex 1 signed by Customer by such date, Customer shall be deemed to have elected not to renew the Contract.
15. The Court agrees with Nynex that the term of its Contract with defendant Moore was three years, not one year as argued by Moore. It does so for several reasons:
a. First, the plain language of the Contract unambiguously provides that "NTI shall provide Service at the Service Site for a period of three (3) years commencing on March 16, 1991 ("Term")." Id., 82. This language leaves no room for construction, and there is no other language within the Contract which suggests to the contrary. It is true, of course, that Section 9 of the Contract makes reference to "annual renewal periods." It dichotomizes, however, between "the Term" and "any annual renewal period," providing that required notices of charges for service or of anticipated non-renewal must be made by CT Page 5283 fixed deadlines before the start of each. Nothing in Section 9 purports to affect, much less abrogate, the three-year Term of the Contract, though it plainly calls only for one-year renewals of that Term.
b. Similarly, nothing in any extra-contractual document can fairly be understood to modify or abrogate the Contract's clear provision regarding the length of the Contract Term. Section 10 of the Contract, to reiterate, clearly states that the Contract itself "constitutes the entire agreement . . . with respect to the subject matter hereof and supersedes all previous negotiations, proposals, commitments, writings and understandings of any nature whatsoever." Id. This language logically confines the Court's attention to the Contract's own provisions for the purpose of finding their true meaning. Surely, it clearly instructs all readers of the Contract to pay no attention at all to other documents outside the Contract when attempting to ascertain the intent of those who wrote it.
c. An exception, of course, must be made for any after-occurring agreements between the parties to modify the original terms and conditions of the Contract. To be effective, however, Section 10 of the Contract instructs that "[a]ny changes to the Contract requested either by Customer or NTI may only be affected (sic) if mutually agreed upon in writing." Id. Here, there are no such agreed-upon written changes. In fact, the only person from Nynex who ever wrote correspondence suggesting that the Contract had a one-year term was Ms. Long-Olson, a clerical assistant with no proven authority to modify her principal's agreement. Even, however, had she had such authority, her communication to Moore did not result in an agreement in writing, but rather in a refusal to deal further with Nynex under the terms previously agreed upon. In sum, the agreement between the parties was never altered in the only way permitted thereunder. Thus it is that the Term of the parties' Contract was always three years, extending from March 16, 1990 through March 15, 1993.
16. As a result of Moore's termination of the Contract, Nynex claims that it lost profits of two types: (1) profits on its standard billings for Service under Section 2 of the Contract; and (2) profits for Additional Services it claims itself reasonably likely to have been CT Page 5284 asked by Moore to perform under Section 6 of the Contract during the last two years of the Contract. At trial, the plaintiff presented evidence which the Court credits that the monthly service charge for the second and third years of the Contract would have been $2070. This would have resulted in gross annual revenues to Nynex of $24,840 per year for the two years remaining on the Contract. Calculated, based on past profit percentages, at the projected annual rate of 60 percent of gross revenues, Nynex's lost profit in the last two years of the three-year Contract Term was $29,808.
As for Nynex's claim that it would also have earned profits from the performance of Additional Services for Moore during the balance of the Contract Term, the record here presented is inadequate to justify such a finding. Lacking any particular records concerning Moore's requests for such Additional Services during the first year of its three-year Contract or during any prior one-year contract period, Nynex sought to introduce evidence as to the dollar amount of Additional Services typically rendered in the Greater Hartford area during the average contract year, calculated on a per-port basis. This evidence was offered with the observation that the size of Moore's telecommunications system was "normal" for the area, but without any basis for determining whether its needs for Additional Services, including additions to or modifications of its existing systems, were the same as or different than those of other Nynex customers. To project Moore's needs for Additional Service on the basis of such area-wide data would require impermissible speculation which this Court will not engage in.
In addition, Moore presented testimony which the Court credits that when additional services were needed, it typically made ninety to ninety-five percent of the necessary charges or additions itself, without calling Nynex to assist it. That being so, the already difficult task of projecting Nynex's anticipated profit, if any, from Moore's likely requests for Additional Services is made even more difficult and conjectural. In sum, the Court can make no legitimate finding on this record as to whether and to what extent Nynex may have lost profits from the performance of Additional Services under Section 6 of the Contract by reason of Moore's repudiation. CT Page 5285
17. Notwithstanding the foregoing findings, Moore claims that Nynex has no right under the Contract to recover lost profits in the event of its termination of the Contract before the end of the Contract Term. On this score, it relies on the language of Section 8 of the Contract, which to reiterate, provides that
 In the event this Contract is terminated by either party, neither party shall have any further obligation to the other party except that NTI shall refund to Customer any portion of the charge paid for Service for the period subsequent to the effective date of termination less any amounts ten due NTI for Service and/or claim for Additional Services performed prior to such termination.
For the following reasons, the foregoing provision is inapplicable to this case.
Reading all of Section 8, it is apparent that the foregoing passage applies only in situations where termination of the Contract is expressly permitted under the Contract. Far from an open-ended invitation to walk away from the Contract at any time, the first paragraph of Section 8 specifies as follows the only set of circumstances in which the Customer, defendant Moore, could terminate the Contract without incurring additional obligations beyond making payments for services rendered prior to termination.
 In the event of a material breach of this Contract by NTI which shall continue for fifteen (15) or more days after written notice of such breach (including a reasonably detailed statement of the nature of such breach) shall have been given to NTI by Customer, Customer's sole and exclusive remedy shall be to terminate this Contract by providing written notice thereof to NTI.
CT Page 5286
By listing this explicit condition as the basis upon which the Contract might be terminated without further obligation, the parties plainly evidenced their intention not to permit the termination of the Contract under any other circumstances.
Here, there is no evidence that the Contract was breached materially by Nynex for over fifteen days after written notice of such breach was given to Nynex. There is no evidence of a breach of the Contract at any time, or of any written notice so claiming. Indeed, even the letter from Mr. Robinson by which the Contract was purportedly terminated made no claim of or reference to a breach of any kind. In short, the limitation-of-obligations provision of Section 8 has no applicability to this case.
Conclusions of Law
For the foregoing reasons, the Court concludes that by terminating its Contract with Nynex on March 2, 1991, Moore breached the Contract and thereby caused Nynex to lose profits of $29,808 which it would have earned as a percentage of annual billings during the final two years of the Contract Term. By virtue of the parties' stipulation, moreover, the Court finds that Moore owes the plaintiff $1515.50 for services performed prior to termination, plus interest on that wrongfully withheld sum in the amount of $568.32. Interest is not assessed or awarded on the lost profits of $29,808, however, for though the Court disagrees with Moore's reading of the Contract and its resulting understanding of its obligations thereunder, it finds that Moore s detention of money was not "wrongful under the circumstances." Cecio Bros., Inc. v. Feldman, 161 Conn. 265,275 (1971). As Moore appears to have taken its position on this matter in good faith, the interests of justice do not require the allowance of pre-judgment interest on that portion of Nynex's claim. See General Statutes § 37-3a.
Judgment is therefore entered for the plaintiff, Nynex Meridian Systems, against the defendant, Moore Medical Company, in the amount of $31,991.82.
Michael R. Sheldon CT Page 5287 Judge